## Bright v. Commonwealth.

(Decided October 8, 1929.)

C. H. BUSH and M. D. GRUBBS for appellant.

J. W. CAMMACK, Attorney General, and S. H. BROWN, Assistant Attorney General, for appellee.

Opinion of the Court by Commissioner Hobson— Reversing.

Pallie Bright was shot and killed by her husband, Sanford Bright, on January 29, 1929. He was at once arrested and placed in jail without bond. On March 4, he was indicted. On March 21, the case was called for trial. The defendant filed affidavit for continuance supported by the affidavits of his attorneys. The motion was overruled. The trial was had, resulting in a verdict finding him guilty and fixing his punishment at death. He appeals, earnestly urging as grounds for reversal: The refusal of the court to grant him a continuance, the misconduct of the commonwealth attorney in the interrogation of witnesses and in the final argument of the case, the failure of the court to give an instruction on involuntary manslaughter, and newly discovered evidence.

In the affidavits for continuance he showed these facts: It was only about six weeks since the offense charged was committed; he was not able to obtain counsel until after the term of the court began; he had been in jail all the time; his mother finally obtained counsel for him; his counsel had been busy in other cases and had no time to prepare his defense. There was a great deal of prejudice against him on the part of members of his race who are related to his wife, and they through the colored lodges had brought pressure upon his important witnesses so that they were restrained from testifying for him, and by these methods had produced a condition of sentiment in the community making it impossible for him to have the semblance of a fair trial at that term, as these causes prevented him from getting testimony which it was necessary for him to have in order to have a proper presentation of his defense. He also showed that a large number of witnesses, whom he had subpoenaed and would give important testimony for him, were absent without his consent or procurement. His two attorneys filed their affidavits stating in substance the same facts, and stating that they were fully advised that there was an organized effort to convict the defendant and put him to death, and that a continuance until the June term was necessary that justice might be done. The commonwealth attorney admitted the affidavit to be read as the testimony of the absent witnesses, but the affidavit showed that the proper effect of the testimony of these witnesses could not be had without their presence in court.

The defendant and his wife were both negroes and he was wholly without means.

The proof on the trial showed that the defendant and his wife were married about three years before; that she left him in August, 1928, and did not live with him after this. He was very much in love with her and from time to time was making earnest efforts to get her to return to him. She had an admirer, Lucien Payne, who was showing her marked attention. On Saturday, January 26, the defendant met his wife at an eating house in the town. He went up to her and kissed her; she pushed him away, saying that she did not want to have anything more to do with him. About that time Lucien Payne came to the door and said to another on the outside that he was going in to see his girl, but he must look out for "Old Ace," a nickname for appellant. As Payne came into the door, appellant met him and knocked him down. Nothing more occurred there. The parties left. This was Saturday night. Monday morning about 7 o'clock appellant came to the house where his wife was living with her sister. As the sister testified, they were both in bed, and thinking that he had come for 75 cents that was due him for coal, told the sister's son to give him 75 cents from the mantlepiece. He was at the kitchen door; the son took him the money, and he then came into the room where the two women were in bed, and without saying anything, according to the sister's testimony, caught hold of his wife's hand. He had a gun; she was swinging to the gun. He dragged her out of the bed. The sister ran out of the front door for help. He was trying to get his wife out of the back door; they were scuffling, and she did not see any more of it, but she heard her sister say: "Oh, Bright, please don't kill me."

Pens Fendrix, to whom the sister ran and who lived next door, says that he heard them hollering, and when he got out to the door of his house they were out in the space back of the kitchen door; that Bright was going backwards like a crawfish, she had hold of the gun, and he had hold of her legs dragging her. When he had dragged her about 20 yards, he shot her with his left hand and held her with his right hand; and when he shot she gave up, and he shot her then in the side. He then took the gun by the small part of it and struck her twice on the head, the same as killing a beef. He then went around to the barn and loaded the gun, came back, and shot her in the side.

Betty Buckner, who also lived near by, says that she heard the screaming, and after appellant pulled his wife out of the door she said to him: "Lord have mercy, Sanford, don't kill me, I wouldn't bother you, please don't hit me any more." She looked out of the window and saw him and her have hold of the gun. He was trying to get it out of her hand, and she was telling him: "Don't hit me any more." But at that time he got the gun out of her hand and knocked her down, and after he knocked her down he took the gun and shot her. Then he stepped off a little piece and reloaded the gun and shot again. She was lying there on the ground.

Sylvia Grimes testified that they both had hold of the gun; she seemed to be pulling back on it; he was pulling the gun, going in the direction of the stable. The witness looked back for a moment, and when she looked out again the woman was near the stable on the ground. He broke his gun and took out a shell, put in another, then she heard another shot.

Tommy Sargent says that when he went to the door they were tussling over what he thought was a stick; that they went towards the stable; Bright went backwards and was pulling her after him; "I shut the door but I heard the first shot." These were all the witnesses that the commonwealth introduced.

On the other hand, the defendant testified that when he got there his wife had gotten out of the bed and was standing on the floor, and he began to talk to her about coming back to him, and she said, "Bright, go away, I don't never want to live with you no more, some day me and Lucien Payne will live together." Then he lost control of himself altogether. He had a gun with him; she grabbed for the gun and he did too; they were tussling and wrestling over the gun. He walked backwards out of the house. She had hold of the gun and he had hold of it, and the gun went off, but only one time, in the struggle. He had no purpose to kill his wife. He had the gun with him expecting that he might meet Payne that morning; that Payne usually went armed. The defendant also introduced proof tending to show from the condition of her body that his wife was not struck at all by him. He introduced on the trial no witness who saw the difficulty, but on the motion for a new trial he introduced the testimony of C. O. Mitchell, a white man, who said he was driving by that morning in a truck and saw Sanford Bright and his wife outside the house in a scuffle

over a gun; that they were just emerging from the door of the house when he saw them; they were scuffling over the gun for some few minutes, and during the fight the gun was discharged and both sank to the ground. He then saw appellant get up and leave the scene. He saw the fight from the time Bright and his wife wrestled from the door into the yard until the gun was discharged and Bright left, and Bright did not have the woman on the ground at any time during the fight until they both appeared to fall at the time the gun was discharged. The woman was not dragged by Bright at any time, he did not strike her at all, and no blows were exchanged during the scuffle. The woman was not crying, but was cursing Sanford Bright over the gun. Bright did not go behind the stable or reload the gun or shoot the woman after she had fallen. There was only one shot fired at all during the fight, and that occurred as above stated.

The defendant introduced a number of witnesses proving his good character, and the commonwealth attorney asked each of these witnesses if they had not heard of his beating up this one or that one, naming from four to six people. The witnesses all said that they had not heard of these things, and this conduct of the commonwealth attorney is complained of as prejudicial to the defendant, in getting before the jury in this way that he was not a man of good character.

Appellant proved by his mother and other witnesses that after his wife left him he would stay up every night and sit up and sleep; that he would talk to himself and call her name; his mind was worried; he had always been a good son, but he was fractious and not like himself. He showed by two physicians who had treated him that he was of unsound mind. The court instructed the jury on insanity, but gave no instruction on involuntary manslaughter. The bill of exceptions contains the following as to the charge of misconduct of the commonwealth attorney: "It further occurred during the closing argument of the commonwealth attorney, John F. King, that he bitterly attacked the defendant, stating that there was a deluge of crime in the country, and the way to put a stop to it was by inflicting the death penalty, to which remarks made in said closing argument the defendant by attorney objected and excepted, which was overruled by the Court, to which the defendant by attorney excepted and still excepts."

The defendant was forced into trial about six weeks after the homicide without any witness present who knew the facts of the homicide. He had been in custody and had been unable to employ an attorney until about the time the indictment was found. If he had had at the trial the testimony of C. O. Mitchell, the case would have been set before the jury in a very different light, and if Mitchell's testimony was true, he was entitled to an instruction on accidental shooting and on involuntary manslaughter. Mitchell's testimony is confirmed by some circumstances appearing in the record. The testimony of the witnesses for the Commonwealth is inconsistent one with the other. The court is therefore clearly of the opinion that the newly discovered evidence is of a character so controlling that it might reasonably change the verdict. Jones v. Commonwealth, 230 Ky. 26, 18 S. W. (2d) 287, and cases cited. The court does not find any other substantial error in the record. When the defendant introduces a witness to prove his good character, the commonwealth attorney should not ask the witness if he has heard of this or that thing that the defendant did, unless he has reason to believe that the defendant did these things. The commonwealth attorney in his concluding argument should not go outside of the testimony in the case, but he may make an appeal to the jury on the basis of facts of general common knowledge.

Judgment reversed, and cause remanded for a new trial.